Ms. Krieg. Good morning, Your Honors. My name is Barbara Krieg. I represent the appellant, Juan Antonio Manrique. Mr. Manrique is also present in the courtroom with us today. This case represents what should have been a relatively straightforward application of the facts to the law, and that is that the record evidence showed, record evidence demonstrated and proved, that Mr. Manrique had a well-founded fear of future persecution if he were forced to return to Guatemala. And the record showed that he established that well-founded fear of persecution on two separate grounds, one based on the presumption that arises from proving past persecution, and then separately from that the independent proof based on the subjective and objective test. Now, unfortunately, the immigration judge made a basic error in the law, and the immigration judge held that he could not, under any circumstances, find past persecution, and for that reason he didn't even do the analysis, because, according to the immigration judge and in his opinion, it's not possible to find past persecution where an individual is not himself harmed, as he stated, erroneously stated, that the law was that mere threats alone cannot constitute past persecution. That is not the law. Because of that error and because of the fact that the Board of Immigration Appeals then summarily affirmed the immigration judge's decision without doing any analysis itself, this Court is facing a de novo review of the record, a review to determine, in our opinion, that the evidence proves that Mr. Manrique did establish past persecution such that he has the presumption of a well-founded fear of future persecution. How do you get to the point that we have de novo review of the record? We get to decide all of this ourselves? There's no other option, Your Honor, because the immigration judge did not decide that issue. The immigration judge set forth an incorrect legal standard, and where there is a mistake of the law, this Court is to do a de novo review. But the Congress says, I should say the Supreme Court says, under Ventura, if the administrative agency fouled up, then we send it back to them. We don't do de novo review of facts. That, Your Honor, was on a discretionary element. As I understand it, the Ventura case was dealing with the determination as to whether country condition the government had proven a change in country conditions. Ventura is talking about standard administrative law theory. If the agency makes a mistake and doesn't think it has to review facts and doesn't review them, we send it back to the agency. That's what Ventura is talking about, I think. But I think under these circumstances, you have an incorrect legal standard. Well, if we have an error of law, then we can correct that. But we haven't seen the witnesses. You're not proposing to bring the witnesses in here. We can't do those kinds of credibility determinations in this context, can we? No, Your Honor. But at the same time, the immigration judge did not make any adverse credibility determinations as to the witnesses. And where that is done ---- That's not the way that I read the I.J.'s opinion, counsel. I read the I.J.'s opinion to question the credibility in a number of instances, particularly the affidavit that was submitted by your client's mother. Your Honor, where an immigration judge does not make an outright negative adverse credibility determination, there is no adverse credibility determination. The I.J. immigration judge said, and Ken says he did, well, gee, I sort of doubt that, you know, this may have been the case, although in his case he took a statement from Mr. Manrique's mother and then cast doubt on the statement based on what Mr. Manrique himself had done in his essays and his paperwork. That does not constitute an adverse credibility determination, and that is addressed in our brief. In sum, the Court does not find credible, nor has the Respondent established that his father was a victim of government assassins, nor would the Respondent or the mother target for government to do prizes. But, Your Honor, that is not ---- Does not find credible. That is not an express adverse credibility determination as to particular testimony or witnesses. Thank you. As a separate ground, Your Honors, this Court does review the record and should review the record to determine that the immigration judge did not rely on substantial evidence. His adverse determination that Mr. Manrique did not establish on an independent basis a well-founded fear of persecution is not supported by the record evidence. And, in fact, the record evidence establishes and compels the conclusion, we would in fact prove a well-founded fear of persecution. That is under the test of a subjective fear of return and objective circumstances that support the subjective fear. The basis for that well-founded fear of persecution brings into it the facts that we submit also establish the past persecution, the kidnapping and murder of Mr. Manrique and his political opinions, the threats to Mr. Manrique and his mother on the imputed political opinions of his father. We also submit, Your Honors, that that case has been strengthened. Mr. Manrique's case for well-founded fear of future persecution has been strengthened by this Court's recent decision, the Thomas decision, that establishes that family membership is also a protected ground and a basis for finding political asylum. Based on the record evidence in this case, the persecution suffered by Mr. Manrique's father, his mother, and by himself, the record demonstrates that that was not only on the basis of imputed political opinion, but also on the basis of family membership, that Mr. Manrique was sought out because he was the son of his father, also named Juan Antonio Manrique. You know, and I understand how you read the record. You represent your client. You read the record as favorably as you can for your client. But when we look at it and we review, don't we have to look at everything? Certainly, Your Honor. All right. What happened in 1986 when the strangers came looking for him? What happened in 1986 was that the strangers came looking for Mr. Manrique's mother and himself, that several days later, Mr. Manrique How many years was that before he decided it was time to apply for asylum? Before he – that happened in 1986. Right. He came here in 1988. He applied for asylum as soon as he realized that he was not here legally, Your Honor. Mr. Manrique was here I thought he applied in 96. He applied in 1997. He came here as a child. Mr. Manrique did not realize He applied in 97 and he bases persecution on something that happened to him 10 years prior. Correct, Your Honor. But there were also incidences after he left Guatemala to prove that there was still there were still the individuals, the government, presumed government representatives looking for him. After he left for the United States, armed strangers still went to the family house looking for him. After he left for the United States, armed strangers came and interrogated one of the uncles who lived at that house, asking where he was. When that uncle would not tell them where Mr. Manrique was, that – his uncle was beaten. His uncle died that same day from a heart attack induced from the beating. In addition to that, Your Honor, in so many of these cases, you – the asylum applications, at least until recent changes in the law, inevitably come in years after the fact. And the point of view for looking at is, what happened while he was in the country? How severe were those incidents while Mr. Manrique lived in Guatemala? And the only relevant inquiry then would have been, had country conditions changed to the point where he should no longer have a well-founded fear? He applied for asylum right after he turned 18 years old, when he realized that he did not have a Social Security number, and he was applying for his financial aid applications for NYU. At that point, he said, I'm going to do something about this. And he turned himself in to the government and said, I am here. I understand that my status has not been legalized. I deserve political asylum. Please, here is my application. The INS did not argue changed conditions below. The INS cannot argue that now. The government cannot argue that now. What evidence is there in the record that suggests that Mr. Manrique's father was kidnapped by the government? Mr. Manrique's father was a proven student leader, student activist at San Carlos University. Were any of his editorials in the newspaper submitted in the evidence? Your Honor, I don't believe that they were. Were any of his editorials on Radio San Carlos? No, Your Honor, those were all radio commentaries. But this evidence that he had, that Mr. Manrique had written and published oral criticism of the government, all came in at the very end and not in Mr. Manrique's application to the BIA. Correct, Your Honor. That was because the information then came from his mother, and his mother had not informed Mr. Manrique. But there wasn't anything to corroborate any of that. I mean, if he had published things in the student newspaper, there might be records of those kinds of things. Right. There are articles about Mr. Manrique, about his father, and we've submitted those in the record, that were published about his disappearance and kidnapping in 1981. And the immigration judge himself credited the testimony that Mr. Manrique's father was on the United Nations-sponsored TV program speaking out against the government. The immigration judge himself said, well, you know, if the timing was established so that it turns out that that was broadcast shortly before the father's kidnapping, we can assume a political position. But we don't know the identities of any man who came to the house, any man who were seen kidnapping. And we don't have any way of – we don't have any direct evidence that any of those were government officials doing. Your Honor, I think it's virtually impossible to have direct evidence of that. We do have evidence that in 1995, a former member of the government secret police did disclose to the family that Mr. Manrique's father was in fact taken by the government and was in fact murdered and that he knew where his father's body was. But that he was afraid to reveal where that was for fear of his own life and for fear of the life of the family relative to whom he was disclosing that information. Thank you. Okay. Ms. Smiley? You came closest to not being here when your case was called, didn't you? I was in the other courtroom. I had another argument. I see. You can't be at two places at the same time. No. May it please the Court, Joan Smiley from the Department of Justice here on behalf of the Attorney General. The objective component for asylum eligibility requires a showing by credible evidence to support a reasonable fear. Here, the immigration judge, who was in the best position to determine petitioner's credibility as the trier of fact and to evaluate the evidence in the record, found that his claim was not credible. The judge meticulously set forth numerous discrepancies in his decision, inconsistencies. It's a 24-page decision in which he sets out the various versions that were given in the testimony and the documentary evidence. In 1996, the claim was that his father had been kidnapped in 1982. Then later he says 1981. Oh, I see. Okay. First it was by the guerrillas. Then later, no, it was by the government. And then it was by unknown individuals on February 24th, 1982. His mother indicated that the father disappeared in 1981 and never mentioned by guerrillas or unknown individuals. She said it was by government forces. Then there were discrepancies regarding whether there were any problems that occurred after his father disappeared. There was testimony in the affidavit from his mother that nothing had happened for two years after the disappearance. And then at page 110 of the record, his mother testified that nothing happened for five years after the disappearance until January of 1986. You know, the difficulty here is it seems that Enrique himself is straightforward, honest, decent kind of person. The problem is he doesn't really know anything. It comes from his mother. And the IJ is having an awful hard time with his mother's credibility. Is that right? Well, I think the immigration judge had a hard time with the mother's credibility as well as the credibility of the petitioner himself. Since earlier when he first applied for asylum in 1997, he didn't mention anything about the death of his uncle and other key elements, problems, concerns. Well, that's what I kind of mean. He doesn't know anything. I mean, he obviously didn't and not obviously, but arguably didn't or doesn't know anything except what his mother tells him. It sounds like. The judge also said that that did not have a ring of truth to it in view of petitioner's active investigation and his desire to investigate his father's disappearance. In addition, the discrepancies concerning whether any problems occurred after his father disappeared, the discrepancies concerning the death of his uncle, which he never mentioned in the asylum application, inconsistencies regarding the cause of death of that uncle. The judge asked that perhaps the inconsistencies could be resolved by providing a death certificate that indicated a cause of death. That was not done. Discrepancies concerning his school activities and amnesty international involvement. Again, that was never mentioned in the asylum application or the asylum interview in July of 1997. Also, there were discrepancies concerning whether a televised report concerning his father was in 1978, 79 or at the end of 1980. And therefore, the judge was not sure. It was unclear whether there was a nexus between the TV report and the father's disappearance. At bottom, as the immigration judge found in this case, it was a family tragedy during a violent period in Guatemalan history. The judge did not find that it was a government-related disappearance or killing. Here, of course, the events occurred approximately 24 years ago now, before the peace accords in Guatemala took place on December 29, 1996. The IJ didn't rely on changed country conditions. The immigration judge had before him, it was submitted in the record at pages 397 to 407, the Department of State report, which discussed the peace accords which ended the civil war in Guatemala, those accords. Well, yeah, but the IJ did not find that there were changed country conditions here. He did not. No, he did not, but that evidence is in the record. Here, Petitioner, according to the immigration judge, simply did not establish that he was or would be targeted for government reprisals. The government would submit that the judge's decision is well-supported by substantial evidence and that the decision also includes a finding that the evidence simply was not credible and did not support the claim for asylum. You know what the difficulty is? One possible difficulty, I should say, is the age of the person who has to make a firm affidavit on what happened in 1981 and 1982. The fact that there's a discrepancy, that he disappeared in 81 and then you find he disappeared in 82, ought to have some reference in this record to the age that he was at the time these events happened. But I don't see that. What I see is the discrepancy, which is there, without an apparent awareness of the fact that the person who was making that report had to be going on what he understood, what he remembered, what somebody told him, because he was too young to have been involved and to have firm knowledge. That's what I think. And I don't see that the finder of fact made any reference to that fact when he talked about the discrepancies. The discrepancies are there. But I don't know that the finder of fact made any reference to the age of the petition of the child when he, who's now an adult. But we're talking about things that had happened when he was quite young. Well, the immigration judge referred to the fact that he was a minor. And also the discrepancies are not only in petitioner's recollection, but in the mother's recollection. She's not a minor. Oh, yes. Oh, yes. Oh, yes. Quite a few. And the mother's for a son, so she's going to help him as much as she can. That's human nature. So, yes, that's so. But we are looking. Don't we have to look at him, the petitioner? Yes, but also at the evidence in the record, since it's a record. Oh, yes. Oh, yes. Oh, yes. And that's a very key part of the record here. And the judge also commented. And the question I think now, and the reason I tell you, because you don't get to rebut, the question now, and the one we're going to have to wrestle with, is not so much the reading of counsel, but we look at the record to see if we need to remand with some instructions or whether we can affirm based on the record before us. Now, isn't that what we have to decide? Yes. And we would submit that on the record before you, the judge's decision was correct and is supported by substantial evidence. Unless the panel has anything further, the government. I can tell you, since you're arresting and since this is the, she's got to come in a minute, I think you're right. But I don't see any reference to the age, I mean to his, to the fact, okay, he's made all these mistakes and we've got all these discrepancies, but I must consider the fact that he was X number of years old when this happened. He must have been Y number of years when that happened. Well, the age is referred to in the record. In fact, in his testimony, he repeated it several times that his birth date was February. Oh, yeah, I know. It's his time, but I'm talking about the IJs. Well, the immigration judge was there when the witness testified at page 107. He says his birth date was February 25th, 1979, and that transcript is from October 97. So the judge had to evaluate the facts and see how old he was at each critical juncture. All right. I think that the record's here, and we're going to certainly take another look. Thank you, Your Honors. Very briefly, Your Honors. The perceived discrepancies identified by the immigration judge are addressed in our briefs, and we submit that in many cases there were no discrepancies. For example, there were, in one case there was a misreading of the record as to, for example, the timing of the United Nations TV program. Well, there's certainly a difference in who kidnapped the father and why he disappeared. There's several references as to what happened. We would also refer, Your Honors, then, to the third-party evidence that is in the record. There are, for example, newspaper articles published in 1981 about the disappearance, the kidnapping, and presumed murder of Mr. Menrique's father. That establishes a date. And as Your Honors correctly pointed out, the primary source of Mr. Menrique's knowledge is his family. He was 9 years old when he came to the United States. He was 18 years old when he filed his asylum application. There is, however, a — there is objective evidence, there's third-party evidence in the record that also demonstrates that students at San Carlos University were the targets of persecution by the Guatemalan government. There is record evidence that journalists were the targets of persecution by the Guatemalan government. In other words, there is other evidence upon which the Court could find and the immigration judge should have found that Mr. Menrique did prove a well-founded fear of persecution of the Guatemalan government. The immigration judge could also see that there was — he didn't say it, but there was — should have been available objective evidence to prove certain points, and it isn't — was not made a part of the record. Actually, Your Honor, the immigration judge suggested that if possible, we should get certain documentary evidence, for example, that Mr. Menrique's father was a student at San Carlos University. Or a death certificate. Right. And that was just not possible to get. To show the cause of death. That was just not possible to obtain at the time. Nothing in the record shows it was not — There is, however — Nothing in this record shows it was not possible to obtain it, though. Your Honor, there is in the record a declaration from Mr. Menrique's cousin that gives the facts related to the death of his uncle after the beating by the government representatives. In other words, as I said, there is third-party evidence in the record that should assist the Court in its review. Thank you. Thank you, counsel. The Court will take a brief recess before proceeding to the next case.
judges: Farris, Fernandez, Bybee